FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 MAR 16 PM 12: 16

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUSIANA

| | | |
|---|---|---|
| JONATHAN FARRAR | * | CIVIL ACTION |
| VERSUS | * | NUMBER: 03-0782 |
| DIAMOND OFFSHORE MANAGEMENT COMPANY | * | SECTION "T" (4) |

\* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE DEFENDANT'S VOCATIONAL REHABILITATION EXPERT, TODD S. CAPIELANO

**MAY IT PLEASE THE COURT:**

Defendant, Diamond Offshore Management Company ("Diamond"), submits that plaintiff's Motion *in Limine* seeking to exclude the testimony of Diamond's vocational rehabilitation expert, Todd S. Capielano, should be denied. Mr. Capielano's opinions regarding the plaintiff's vocational potential and earning capacity are not only based upon a reliable foundation, but the methodology which he employed in reaching his opinions conforms to the standards of his profession. Therefore, Mr. Capielano's opinions clearly meet the reliability requirements for expert testimony under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Fee_____
Process_____
X Dktd_____
__ CtRmDep.____
__ Doc. No._____

# I.
## BACKGROUND

In this action, the plaintiff, Jonathan Farrar, has asserted a claim for lost earning capacity related to a back injury which he allegedly sustained while he was working as a roustabout for Diamond on an offshore drilling rig. As the result of his alleged injury, the plaintiff underwent a lumbar laminectomy @ L5-S1 which was performed by Dr. Michael Molleston, a neurosurgeon recommended by his attorney.

In a report rendered on December 1, 2003, Dr. Molleston opined that the plaintiff could no longer engage in manual labor or work in offshore employment due to certain permanent physical restrictions related to his disk injuries and assigned him an 18% total body disability rating. Dr. Molleston also noted that it is probable that Farrar will require additional surgery at the L4-5 level "within the next five years."[1] Significantly, Dr. Molleston did **not** state that the plaintiff is incapable of engaging in gainful employment within his physical restrictions or that he is permanently disabled from work.

Based upon the plaintiff's claims and Dr. Molleston's report, Diamond retained Todd Capielano, a Licensed Rehabilitation Counselor, to evaluate Mr. Farrar's vocational potential and earning capacity.

**Todd Capielano's Written Report**

Mr. Capielano rendered a Vocational Rehabilitation Evaluation on January 29, 2004.[2] The introduction to Mr. Capielano's evaluation discusses the methods which he employed in

---

[1] See Report of Dr. Michael Molleston, attached as Exhibit 1.
[2] See Vocational rehabilitation Evaluation, attached as Exhibit 2.

formulating his opinions. Specifically, he conducted a personal interview with the plaintiff on January 21, 2004; he administered vocational testing, including the *Woodcock-Johnson Test of Achievement-III*, the *Career Occupational Preference System* (COPS) and the *Slossum Intelligence Test-Revised* (SIT); and he reviewed numerous documents, including Mr. Farrar's deposition testimony, his educational records, his earnings records for the past three years, the medical reports of his treating physicians, the medical records provided by various treating health institutions and the vocational evaluation of Cornelius Gorman, plaintiff's own vocational expert.[3]

Significantly, Mr. Capielano noted that Mr. Farrar's reported "Work History" included experience as a "tile installer" and that he had owned his own company, "Farrar Tile," prior to his employment by Diamond.[4] On page 5 of his evaluation, Mr. Capielano provides a **detailed summary** of Dr. Molleston's report on December 1, 2003, noting Mr. Farrar's physical restrictions, impairment rating, and the probability of future lumbar surgery within the next five years.[5] His evaluation also provides a detailed summary of the results of the vocational testing administered to Mr. Farrar, including the COPS self interest inventory which indicated Mr. Farrar's marked preference for occupations in the area of Skilled Technology.[6]

Considering all of the above, Mr. Capielano rendered his "Impressions," which are outlined on page 8 of his report. Noting that Mr. Farrar's physical restrictions, as reported by

---

[3] See Vocational Rehabilitation Evaluation, pp.1-2, attached as Exhibit 2.
[4] See Vocational Rehabilitation Evaluation, p. 3, "Work History,"attached as Exhibit 2.
[5] See Vocational Rehabilitation Evaluation, p. 5, attached as Exhibit 2.
[6] See Vocational Rehabilitation Evaluation, "Vocational Analysis," pp.6-8, attached as Exhibit 2.

Dr. Molleston, limit him to jobs within "the light physical demand level" and jobs which conform to his vocational profile, Mr. Capielano identified several potential jobs which would be suitable for Mr. Farrar within his geographical area, including light duty technical jobs, such as assembly work, service advisor and dispatcher. He also noted that Mr. Farrar's past experience as the owner of his own tile company, provided him with transferable skills from the flooring and tile industry which would be suitable for employment as an estimator or sales person in this area.[7]    Based upon his labor market research in the Hattiesburg area, Mr. Capielano opined that Mr. Farrar's future earning potential ranged between $16,000 and $30,000 per year; the lower end including technical jobs with on the job training and the higher end including work as a tile sales person/estimator.[8] He further noted that Mr. Farrar expressed an interest in technical training as a sound technician, and suggested a curriculum offered by Pearl River Community College in this area, or more specific vocational counseling to determine the suitability of other areas of retraining.[9]

Despite the thoroughness of Mr. Capielano's evaluation, plaintiff challenges the reliability of Mr. Capielano's expert testimony under Rule 702, contending that his opinions are "speculative" and that Mr. Capielano failed to use "any methodology or science in arriving at his conclusions."[10]

---

[7] See Vocational Rehabilitation Evaluation, "Impressions," pp. 8-9, attached as Exhibit 2.
[8] See Vocational Rehabilitation Evaluation, p. 9, attached as Exhibit 2.
[9] See Vocational Rehabilitation Evaluation, p. 10, attached as Exhibit 2.
[10] See Memorandum in Support of Plaintiff's Motion in Limine to Exclude Expert Testimony of Defendant's Vocational Rehabilitation Expert, Todd. S. Capielano, p. 4.

Plaintiff's motion is totally without merit. As will be shown below, Mr. Capielano's testimony as a vocational rehabilitation expert meets the reliability requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

## II.
## LAW AND ARGUMENT

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." In carrying out its gatekeeping function, the district court must assure that the subject of an expert's testimony is grounded in the methods and procedures of science and is based on more than a subjective belief or speculation. *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-590, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing and Packaging, Inc.,* 188 F. 3d 606, 618 (5th Cir. 1999), quoting *Kumho Tire Co. v. Carmichael,* 119 S. Ct. 1167, 1176 (1999).

Notwithstanding the dictates of *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." *United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F. 3d 1074, 1078 (5th Cir. 1996). As *Daubert*

itself recognized, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging expert testimony. *Daubert,* 113 S. Ct. at 2798. Further, the grounds for an expert's opinion merely have to be good, they do not have to be perfect. *In Re Paoli Railroad Yard PCB Litigation,* 35 F. 3d 717, 744 (3d Cir. 1994).

A.    **Speculative Testimony**

Plaintiff first asserts that Mr. Capielano's opinions are speculative because they fail "to take into account that Farrar will require additional surgery and is therefore still unemployable at this time."[11]  Contrary to this assertion, Mr. Capielano clearly considered Dr. Molleston's report in his evaluation, specifically noting Mr. Farrar's physical restrictions and the probability of additional surgery "within the next five years."[12] **Significantly absent from Dr. Molleston's report is any reference to the plaintiff's inability to engage in gainful employment within his physical limitations.**  Based upon the physical restrictions delineated in Dr. Molleston's report, Mr. Capielano correctly determined that Mr. Farrar was capable of performing "jobs within the light physical demand level." [13]  Therefore, there is no basis to support the plaintiff's contention that Mr. Capielano's opinions are speculative in this regard.

---

[11] See Memorandum in Support of Plaintiff's Motion in Limine to Exclude Expert Testimony of Defendant's Vocational Rehabilitation Expert, Todd. S. Capielano, p. 4.

[12] See Vocational Rehabilitation Evaluation, "Medical Summary," p. 5; Also see "Impressions," p. 8, attached as Exhibit 2.

[13] See Vocational Rehabilitation Evaluation, "Impressions," p. 8, attached as Exhibit 2.

**B.    Mr. Capielano's Methodology**

Ignoring that Mr. Capielano's evaluation provides a detailed summary of the methods he employed in arriving at his opinions, including a personal interview with Mr. Farrar, the administration of several vocational tests to determine his abilities and career interests, and a survey and discussion of **numerous** jobs which may be appropriate for Mr. Farrar in his geographical area, plaintiff also complains that Mr. Capielano did not utilize "any methodology or science in arriving at his conclusions" because he failed to address any guidelines which would show that Farrar's limited experience as a tile installer, qualified him to be a salesman."[14]

Significantly, Mr. Capielano noted that Mr. Farrar's "Work History" included his ownership of a tile business, known as "Farrar Tile," which would necessarily have required him to be familiar with the cost of materials and labor for the installation of tile. Based on this work experience, Mr. Capielano reasonably concluded:

> Mr. Farrar may be suitable for jobs such as estimator/sales. This
> would allow him to utilize his experience working as a tile installer
> as well as his experience owning his own company.[15]

Clearly, the consideration of prior work experience is not only an acceptable method of determining a client's potential job opportunities, but it is also an essential component of a vocational rehabilitation examination. Mr. Capielano has not attempted to project Mr. Farrar's salesmanship ability, as plaintiff suggests, he has simply noted, and correctly so, that Mr. Farrar's past work experience in the tile industry qualifies him for this type of job.  Because

---

[14] See Memorandum in Support of Plaintiff's  Motion in Limine to Exclude Expert Testimony of Defendant's Vocational Rehabilitation Expert, Todd. S. Capielano, p. 4.
[15] See Vocational Rehabilitation Evaluation, p. 9, attached as Exhibit 2.

Mr. Capielano has relied upon the same type of information and applied the same type of methodology utilized by other experts in the field of vocational rehabilitation, his opinions meet the reliability standards of Rule 702 and *Daubert*.

## CONCLUSION

The opinions expressed in Todd Capielano's Vocational Rehabilitation Evaluation regarding the plaintiff's vocational potential and earning capacity are based upon a reliable foundation. There is absolutely no medical evidence in this case which establishes that the plaintiff is "unemployable," as he contends. Further, the methodology utilized by Mr. Capielano in formulating his opinions is consistent with the methods applied by other experts in the field of vocational rehabilitation. Accordingly, Diamond Offshore Management Company respectfully requests this Court to deny the Plaintiff's Motion *in Limine* seeking to strike the expert testimony of Todd Capielano.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
& KUTCHER, L.L.P.**

By:

**RICHARD A. CHOPIN** (#4088)
Two Lakeway Center
3850 N. Causeway Boulevard, Suite 900
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9540
Attorney for Defendant,
Diamond Offshore Management Company

8

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this ___11th___ day of ___March___, 2004,

served a copy of the foregoing pleading on counsel for all parties by:

(   ) Hand Delivery                 (   ) Prepaid U. S. Mail

( ✓ ) Facsimile                      (   ) UPS/Federal Express

*Richard A. Chopin*

**RICHARD A. CHOPIN**

## Michael C. Molleston, M.D., P.A.

6701 Highway 49, Suite 205
Hattiesburg, Mississippi 39401
MICHAEL C. MOLLESTON, M.D.        Phone (601) 288-1565    Fax (601) 288-1560

*Mailing Address:*
P.O. Box 15159
Hattiesburg, MS 39404-5159

December 1, 2003

Best Koeppel
Professional Law Corporation
2020 St. Charles Ave.
New Orleans, LA 70130

RE: JONATHAN C. FARRAR
DOB: 4-29-71

Dear Mr. Best:

I am writing to you in regards to your letter for requesting a medical narrative on
Jonathan C. Farrar on 10-2-03.

Mr. Farrar is a 32-year-old man who I initially evaluated in November of 2002. He
had been injured in September of 2002 after an injury after working offshore. He was
pulling on some sort of riser and during this felt numbness, tingling, and then
severe pain in his back. He was treated on the rig for " a pulled muscle" and then
eventually referred for physical therapy. This made his situation more severe.

He underwent an MRI scan of his lumbosacral spine in September of 2002 and this
demonstrated a ruptured disk at L5-S1 with changes consistent with disk injury at
L4-5 as well.

We repeated the MRI scan in December of 2002 and again this demonstrated the acute
disk rupture at L5-S1 and what was interpreted as an asymmetric disk bulge to the
right at L4-5.

Mr. Farrar underwent a diskogram in January of 2003 and this demonstrated
concordant pain at L5-S1 with internal disk disruption. The L4-5 injection was
interpreted as "negative" with low disk compliance and internal disk disruption but
no concordant pain.

Mr. Farrar had an abnormal neurologic exam. He had positive straight leg raising
sign. He had lumbar spasms on palpation of the paraspinous musculature. His lumbar
range of motion was impaired by over 50%.

He underwent lumbar laminectomy at L5-S1 with interbody fusion and posterior
lateral fusion with rods and screws on 2-25-03.



EXHIBIT
_1_

PAGE 2
12-1-03
RE: JONATHAN FARRAR

At the time of the surgery acute disk rupture at L5-S1 was visualized and there was a large hole in the annular ligament at L5-S1 on the right.

Postoperatively he has recovered without complications. He has persistent back pain and takes narcotics on a regular basis. He has had a lot of depression as a result of his injury and the impairment and pains as well. He is on Lexapro for this.

His neurologic exam continues to be abnormal. He has positive straight leg raising signs, paraspinous spasms on palpation, the lumbar spine, and his symptoms are worsened with bending at the waist, standing for any length of time, or sitting without a frequent change in his position.

With medical probability Mr. Jonathan Farrar sustained a substantial injury to his lumbar spine as a result of his work-related accident in September of 2002. At this point he has permanent restrictions of no bending at the waist, no picking up from floor to waist, no lifting over 30 pounds, and regularly no lifting over 20 pounds. He has a permanent partial impairment to the body as a whole of 18% on the basis of his lumbar disk injury at L4-5 and L5-S1. This is according to the 5th edition of the American Medical Association Guidelines for permanent partial impairment rating. Mr. Farrar will never be able to return to any manual labor and specifically cannot return to work in the offshore oilfield.

With regards to future medical care I would allow $2,000.00 per year for the foreseeable future for treatment of back pain including physical therapy, occasional imaging, and medications. Additional surgery at the L4-5 level is medically probable within the next five years and I would allow approximately $25,000.00 for surgeon's fees, and $35,000.00 for hospital fees. He will incur additional expenses for treatment of depression, and a referral to a comprehensive pain management clinic is certainly appropriate for a patient like Mr. Farrar.

I hope you have found this letter helpful with regards to the medical situation of the patient. If I can be of any further service, please do not hesitate to contact me.

Sincerely,




Michael C. Molleston, M.D.
MCM/sm

01/29/2004  14:20   5048349577            CAPIELAND AND ASSOCT              PAGE  02



C A P I E L A N O  &  A S S O C I A T E S

VOCATIONAL REHABILITATION AND COUNSELING

**Todd S. Capielano, LRC, CRC**

January 29, 2004

Mr. Richard A. Chopin
Chopin, Wagar, Cole,
Richard, Reboul & Kutcher, LLP
Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002-8130

RE:  Jonathan Farrar
Our File #:  3865

### VOCATIONAL REHABILITATION EVALUATION

I received this referral for the purpose of a vocational rehabilitation evaluation to clarify Mr. Farrar's vocational potential and earning capacity. I conducted the vocational interview on January 21, 2004. He was accompanied by his twin brother. Mr. Farrar was administered vocational testing including the *Woodcock-Johnson Test of Achievement – III*, the *Career Occupational Preference System (COPS)*, and the *Slosson Intelligence Test - Revised (SIT)*.

I have also reviewed file material provided to include:

1.    Mr. Farrar's personnel file from Diamond Offshore, Diamond Health and Dental Employees Benefits Booklet and training records;

2.    MRI reports of October 27, 2000 and September 30, 2002;

3.    Hospital chart notes of Forest General Hospital;

4.    Prescription records from Anderson Drugs, Owl Drug Store, and John's Discount Drugs;

5.    Medical notes of David Bomboy, M. D., dated October 15, 2002 through December 12, 2003;

6.    W-2 forms including Mr. Farrar's earnings from 2000, 2001, and 2002;

7.    Accident report dated September 7, 2002;

4728 Jefferson Highway • Jefferson, Louisiana 70121
504-734-3703 • 504-734-3707 fax
toddcapielano@bellsouth.net

EXHIBIT
2

Page -2-
Mr. Richard A. Chopin
January 29, 2004
Our File #:  3865 – Jonathan Farrar


8.    Vocational Evaluation of Cornelius Gorman, PhD, dated June 4, 2003;

9.    Medical notes of Dr. Molleston, dated November 2002 through December 1, 2003;

10.    Pain Clinic evaluation report of David McKeller, dated January 16, 2003;

11.    Affidavit of Medical Bills and Records, Hattiesburg Clinic;

12.    Deposition of Jonathan Farrar, dated August 28, 2003;

13.    Medical records from Occupational Medicine Center of West Jefferson.


## BACKGROUND INFORMATION:

Mr. Jonathan Farrar is thirty-two (32) years of age, born on April 29, 1971.  He was born in Lafayette, Louisiana and raised in Purvis, Mississippi.  He currently lives at 704 First Avenue, Purvis, Mississippi 39475.  He resides with his wife and two (2) children, ages two and three (2 and 3).  His spouse is currently in school, full-time. at Southern Mississippi.  She has two (2) semesters remaining in her major, Elementary Education.

Mr. Farrar has two (2) brothers and one (1) sister.  He is a twin, and his brother reportedly has some birth defects.  His parents are reportedly in good health.  When asked about family medical problems, he reported diabetes and high blood pressure runs on his father's side of the family.

Financially, Mr. Farrar receives maintenance benefits of $350.00 every two (2) weeks.  He reported he also receives approximately $1,000.00 per month from his attorney.


## EDUCATION:

Mr. Farrar completed the eleventh grade in approximately 1989 from Johnson Central High School.  He attended part of the twelfth grade, through December of that year.  He obtained his high school diploma via Newport Pacific High School, taking correspondence courses.

Mr. Farrar also took welding courses at Lamar County VoTech School in Purvis, Mississippi for approximately one-and-a-half (1½) years. but did not complete his course work.  Mr. Farrar underwent company sponsored training via Diamond Offshore to include Respirator Issuance and Training, Job Safety

Page -3-
Mr. Richard A. Chopin
January 29, 2004
Our File #: 3865 – Jonathan Farrar


Analysis Training, Diamond Offshore Roustabout Orientation and Training, Sea Survival, Helicopter Safety, and Egress Course, Floor Hands Well-Control Course for Drilling Operation, and Well-Completion/ Well-Work Over Operations, Rigger Training as well as U. S. Coast Guard Marine Firefighting Basic and Advance Training via Delgado Community College. All additional training was learned on the job, provided by employers throughout his work history.

Mr. Farrar denies any military history. He reported an arrest in approximately 1995 or 1996 for driving on a suspended license.


## INTERESTS/ACTIVITIES:

Prior to his injury, Mr. Farrar enjoyed playing the guitar, fishing, and hunting. Since his injury, he reported he has to alternate sitting and standing while playing his guitar. He occasionally attends church. His typical activities of daily living include waking up between 8:00 and 10:00 a.m. (depending on how he slept), watching television, occasionally cooking, taking his children to daycare, folding clothes, and laying down periodically throughout the day. He retires for the night around midnight or 1:00 a.m.


## WORK HISTORY:

Mr. Farrar could not recall the exact dates of his early employment, but reported first working odd jobs on and off from high school to approximately the age of twenty-five (25). He worked as a **construction laborer** in the residential setting when work was available. Additionally, he worked as a **tile layer** with a friend. He also played guitar on weekends at local lounges.

In approximately 1996, he obtained employment with Pioneer Quality Sales and Installation as a **satellite installer** and **working supervisor**. He reported this company went bankrupt in approximately 1997. He then obtained employment with Accent Stone and Tile as a **tile installer**. He worked in this capacity for approximately one (1) year until obtaining employment with Anderson's Paint and Decorating as a **tile installer/subcontractor**. He worked as an **independent tile** layer until approximately February 2000.

He then obtained employment with Addison Construction as a **form carpenter/helper and welder**. He worked in this capacity for approximately six (6) months until beginning his own company, Farrar Tile, as a **self-employed tile installer**. He then began working for Key Energy as a **rig hand** for several months. Mr. Farrar obtained employment with Diamond Offshore, working as a **roughneck**. He worked in this capacity until March 2001 when he then became a **floor hand**. He worked in this capacity until his work-related injury of September 5, 2002. Thereafter, he was put on a light duty status by the safety

Page -4-
Mr. Richard A. Chopin
January 29, 2004
Our File #:  3865 – Jonathan Farrar

representative at Diamond Offshore and worked until approximately September 12, 2002.  Mr. Farrar has reportedly not worked since that time.

**EARNINGS RECORDS:**

The following are earnings of Mr. Farrar from 2000 through 2002.

| YEAR | GROSS EARNINGS |
|------|----------------|
| 2000 | $3,303.95 |
| 2001 | 37,204.58 |
| 2002 | 25,863.34* |

Information provided from W-2 forms.

**MEDICAL SUMMARY:**

Since the material reviewed documents his course of medical treatment, I will attempt only to summarize his status as it relates to his vocational rehabilitation potential/employability.

Mr. Farrar reportedly injured his low back while employed by Diamond Offshore on September 5, 2002.  At the time of his injury, he had been working for this company for approximately two (2) years. Initially after his injury, he was placed on a light duty status by the safety representative at Diamond Offshore.

He did not see a physician until several days later at Work Well in New Orleans.  At that time, he also had an MRI conducted.  An MRI was performed two (2) years prior as a pre-employment requirement.

Mr. Farrar was then seen by Dr. David Bomboy on October 15, 2002.  Dr. Bomboy started a physical therapy program and placed him on an anti-inflammatory agent, and a muscle relaxer, as well as Tylenol 3 for pain.  He was placed on a no work status, and told to return to the office two (2) weeks.

---

* Year of injury.

01/29/2004  14:20    5048349577            CAPIELAND AND ASSOCT          PAGE  06

Page -5-
Mr. Richard A. Chopin
January 29, 2004
Our File #:  3865 – Jonathan Farrar

In November 2002, Mr. Farrar was seen for a neurosurgical consultation and evaluated by Dr. Molleston who opined that he had significant disk disease at two (2) levels, both L4-5 and L5-S1.  Mr. Farrar underwent a diskogram and subsequent surgery on March 25, 2003.

The medical records indicate he was last seen by Dr. Bomboy postoperatively on April 7, 2003, when Dr. Bomboy felt he was progressing satisfactorily in his postoperative recovery and it would take several months before he would reach full recovery.

As of December 1, 2003, Dr. Molleston's report indicated Mr. Farrar has permanent restrictions of no bending at the waist; no picking up from the floor to waist; and no lifting over thirty (30) pounds.  He also indicated Mr. Farrar is to perform no regular or repetitive lifting over twenty (20) pounds and has a permanent partial impairment to the whole body of eighteen percent (18%).  Dr. Molleston stated, "Mr. Farrar will never be able to return to any manual labor and specifically cannot return to work in the offshore field".  Dr. Molleston also indicated that Mr. Farrar experiences a lot of depression and has been prescribed Lexapro.  Regarding his future medical care, he projected treatment for back pain including physical therapy, occasional imaging, and medications.  He also reported that additional surgery at L4-L5 level is medically probable within the next five (5) years.  He would also incur additional expenses for treatment of depression and referral to comprehensive pain management.

Mr. Farrar was last seen by Dr. Molleston on January 14, 2004 and is to return in two (2) weeks from that date for a refill of his medications.

Currently, Mr. Farrar is taking Xanax twice daily, Lortab 10 three (3) times daily, and Soma three (3) times daily as prescribed by Dr. Molleston.  He was recently taken off of Lexapro and was advised by Dr. Molleston to begin taking Wellbutrin on his next visit.

Mr. Farrar is five feet four inches (5' 4") tall, weighing approximately one hundred ninety to one hundred ninety-five (190 to 195) pounds.  He reported he has gained twenty to twenty-five (20 to 25) pounds since his injury.  Mr. Farrar uses a back brace occasionally for support.

His reported physical limitations include being able to stand for approximately thirty to forty-five (30 to 45) minutes at a time, limited walking and sitting for one to one-and-a-half (1 to 1½) hours at a time.  He indicated his pain is progressively getting worse.  He occasionally experiences headaches, which he reported experiencing at the time of this evaluation.

Page -6-
Mr. Richard A. Chopin
January 29, 2004
Our File #:  3865 – Jonathan Farrar


## VOCATIONAL ANALYSIS:

Mr. Farrar's career has been as a "hands-on" worker.  The last few years of his work history included work in the offshore industry.

The following are most closely related to the jobs he has held.

| JOB TITLE | PHYSICAL DEMANDS | SKILL LEVEL |
|-----------|------------------|-------------|
| Tack Welder | Heavy | Skilled |
| Roughneck | Heavy | Semi-skilled |
| Tile Layer | Medium | Skilled |
| Satellite Installer | Medium | Skilled |
| Construction Worker | Heavy | Semi-skilled |
| Floor Worker, Oil Well | Heavy | Semi-skilled |

He has acquired skills and work related abilities including:

- Knowledge of tools, machines, materials, and methods used in construction, tile laying, and offshore work;

- Using shop math to calculate object dimensions, material amounts needed, and material costs;

- Coordinating eyes, hands, and fingers to use hand tools or machines in constructing, making, or repairing objects;

- Adhering to object specifications or standards;

- Overseeing work of others.


## VOCATIONAL TESTING:

Mr. Farrar was administered the *Woodcock-Johnson Test of Achievement – III* in order to obtain a better picture of his academic functioning levels.  He was also given the *Slosson Intelligence Test - Revised (SIT)*, as well as the *Career Occupational Preference System (COPS)*, a self-administered Interest Inventory.

Page -7-
Mr. Richard A. Chopin
January 29, 2004
Our File #:  3865 – Jonathan Farrar

On the Woodcock Johnson, he received the following profile:

| SUBTEST | STANDARD SCORE | PERCENTILE RANK |
|---|---|---|
| Letter-Word Identification | 100 | 50th |
| Passage Comprehension | 100 | 49th |
| Calculation | 99 | 47th |
| Applied Problems | 91 | 26th |

Letter Work Identification was the first subtest given in this battery of tests. Mr. Farrar scored in the 50th percentile. He scored at the college grade equivalent and was able to correctly pronounce seventy (70) words out of seventy-six (76).

Passage Comprehension was the second subtest given in this battery of tests and Mr. Farrar also ranked at the college level, at approximately the 13.0 grade equivalency.  This section of the test involves understanding words and how they fit into a sentence or paragraph format.

The mathematics portion of this test includes two (2) subtests, Calculation, and Applied Problems. On both tests, Mr. Farrar scored between the eighth and ninth grade levels.  He was able to correctly perform basic mathematic calculations including addition, subtraction, multiplication, and division. He had difficulty with fractions and algebraic formulas.

On the Applied Problems, or word problems section, Mr. Farrar was able to complete problems related to currency, mileage, and amounts needed.  He did answer quickly throughout this section and was reminded to use his paper and pencil as needed.  During this part of the test, he reported he was experiencing a headache.

The *Slosson Intelligence Test - Revised (SIT)* was the second instrument given to Mr. Farrar.  On this test, he received a raw score of one hundred thirty-nine (139) and a standard score of one hundred seven (107). This indicates that Mr. Farrar ranked within the average range of intellectual functioning.

The last test given to Mr. Farrar was the COPS, an Interest Inventory.  This inventory is self-administered and scores are broken down into fourteen (14) career occupational preference categories. Of the fourteen (14) categories, Mr. Farrar scored at or above the 65th percentile in the areas of **Skilled Technology, Professional Technology,** and **Professional Science.**

01/29/2004  14:20   5048349577          CAPIELANO AND ASSOCT            PAGE  09

Page -8-
Mr. Richard A. Chopin
January 29, 2004
Our File #: 3865 – Jonathan Farrar

His highest score was in the area of **Skilled Technology** ranking at approximately the 78th percentile.

**Skilled Technology** occupations involve working with ones hands in a skilled trade concerned with construction, manufacturing, installation, or repair of products and related fields of construction, electronics, and mechanics.  Sample occupations in this category may include construction labor worker, painter, machinist, and electronics assembler/repairer, to name a few. High levels of interest in this area may also be reflective of his past work history.

**Professional Technology** occupations involve responsibility for engineering and structural design and the manufacture, construction, or transportation of products or utilities.  Sample occupations within the areas include electrical engineer, computer systems engineer, applications programmer, mechanical engineer, design engineer, structural drafter, and tool programmer, to name a few.

**Professional Science** occupations involve responsibility for the planning and conducting of research.  They also include collecting and applying systematic accumulation of knowledge in branches of mathematical, medical, life, and physical sciences.  Sample occupations include surgeons, computer programmers, and physical science specialists.

**IMPRESSIONS:**

There are several scenarios that can be considered when identifying job alternatives suitable for Mr. Farrar.  The most recent report from Mr. Farrar's treating physician, Dr. Molleston, indicates that he will have permanent restrictions that appear within the light range of physical demands.  Since the jobs he performed in his past are all within the medium to heavy physical demand level, he will not be able to return to these types of jobs.  Nevertheless, he will have access to jobs that are within the light physical demand level and less as well as jobs within his overall vocational profile.

First of all, considering his age, education, work experience, vocational testing results, as well as transferable skills and considering the restrictions by Dr. Molleston, he may be suitable for jobs in his geographical area including production worker/assembler, service advisor, dispatcher to name a few. Production or bench assembly work involves utilizing the hands and are usually learned via on-the-job training.  This is how Mr. Farrar has learned most of the jobs in his past work.  He may also be suitable for employment as a service advisor and dispatcher.

Page -9-
Mr. Richard A. Chopin
January 29, 2004
Our File #: 3865 – Jonathan Farrar


Considering transferable skills from the flooring and tile industry, Mr. Farrar may be suitable for jobs such as estimator/sales. This would allow him to utilize his experience working as a tile installer as well as his experience owning his company.

We have performed preliminary labor market research of employers in or around the Hattiesburg area, which is the nearest and largest labor market area to Mr. Farrar.

### 1. Service Writer
This automobile dealership located in Purvis, Mississippi is currently taking applications for the above position for potential hire. This position involves receiving phone calls and in person contact with customers and writing service tickets of automotive repairs. Will greet customers and write up tickets and provide these to the mechanics. Will perform initial inspection of the vehicle to determine the customer's complaints. This is considered light level employment with on-the-job training provided. Starting earnings are between $8.00 to $9.00 per hour, depending on experience.

### 2. Service Writer
Another automobile dealership in Hattiesburg is also accepting applications anticipating an opening for the above position. This company also offers on-the-job training with starting earnings at approximately $8.00 per hour.

### 3. Sales Person/Estimator
This flooring/appliance company is hiring for the above position located in Hattiesburg. The job involves calling on customers via telephone and in person and driving to customer's sites to measure square footage and compute costs for the installation of flooring. The employer is looking for someone with a background such as Mr. Farrar's for consideration. This is considered light level employment with alternating sitting, standing, and walking. Maximum lifting is up to twenty (20) pounds. This is a commission based job, based on the sales generated. According to the employer, earnings are up to $30,000.00 per year, depending on the aggressiveness of the sales person/estimator.

Earnings, post injury, for jobs listed above with direct placement or on-the-job training are up to the $16,000.00 to $19,000.00 per year range. The higher end, in estimating/sales, is up to $30,000.00 per year.

Another scenario is the possibility of retraining. Mr. Farrar expressed an interest in some type of additional schooling or technical training. Although he was not specific as to the exact training he is interested in pursuing, he did express some interest in the music industry, as this has been an avocational interest of Mr. Farrar's. He indicated the possibility of training as a sound technician. Sound engineers and technicians install, test, repair, and set up, as well as operate electronic equipment used to record and transmit radio and television programs[1]. Training for this field is usually via technical school, community

---

[1] Occupational Wage Survey, U. S. Publishing 2003; State of Mississippi median earnings.

01/29/2004  14:28   5048349577              CAPIELANO AND ASSOCT              PAGE  11

Page -10-
Mr. Richard A. Chopin
January 29, 2004
Our File #: 3865 – Jonathan Farrar

college, which is in the area of Broadcast Technology or Electronics Technology. If training is required by employers in this field, Pearl River Community College in Hattiesburg, Mississippi offers an electronics technology curriculum. Further research may be necessary concerning the enrollment requirements, job outlook, and earning potential for this field. With training in electronics technology, earnings for electronic repairers in the state of Mississippi are $11.22 per hour[2]. Other types of retraining may be suitable for Mr. Farrar, but would best be determined should he receive more specific vocational counseling. These types of services may be available to him through the Mississippi Division of Vocational Rehabilitation. He was directed to apply for such services.

Mr. Farrar has demonstrated pre-injury earnings of approximately $37,205.00 annually. Within the confines of his vocational profile and restrictions outlined by Dr. Molleston, his post-injury earning capacity is up to approximately $30,000.00 annually, with direct placement or on-the-job training. Starting earnings may be in the $8.00 to $9.00 per hour range. With retraining, depending on the specific field, earnings are comparable to $30,000.00 per year.

Mr. Farrar may benefit from vocational rehabilitation counseling, which may assist in helping him fine-tune a vocational plan with either direct job placement or retraining. He may receive the above services, if eligible, from the Division of Vocational Rehabilitation in Mississippi. He can also receive vocational counseling through private vocational counselors or through this office if authorized. It should also be considered that if Mr. Farrar is in need of any additional surgery as suggested by Dr. Molleston, this may affect his employability until such time he is recovered from such surgical intervention. Additionally, any future treatment offered and provided concerning depression or pain management as indicated by Dr. Molleston may help increase his return to work potential.

If I can provide you with any additional information please feel free to contact me at any time.

Sincerely,

TODD S. CAPIELANO, LRC, CRC
Vocational Rehabilitation Counselor

TSC/cgm

Enclosure

---

[2] Occupational Wage Survey, U. S. Publishing 2003; State of Mississippi median earnings.